Vincent F. Gerbino (VG 0555)
Michael A. Callinan (MC 7052)
BRUNO, GERBINO & SORIANO, LLP.
445 Broad Hollow Road, Suite 220
Melville, New York 11747
Telephone: (631) 390-0010
Facsimile: (631) 393-5497

*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

                                     Plaintiffs,               Docket No.:_____( )

         -against-                                **Plaintiffs Demand a Trial**
                                                       **By Jury**

SEASONED CHIROPRACTIC, P.C.,
JOSEPH LODESPOTO, JR., D.C.,
                                 Defendants.
-------------------------------------------------------------------------X

## COMPLAINT

      Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively referred to as

"GEICO"), as and for its Verified Complaint against the Defendants, hereby alleges, upon

information and belief, as follows:

### INTRODUCTION

      1.     This action seeks to recover more than One Hundred Ninety Three Thousand Five

Hundred Ninety Dollars and Ten Cents ($193,590.10) that the Defendants have acquired from the

Plaintiffs by submitting, and causing to be submitted, thousands of fraudulent No-Fault insurance

1

charges under the name of a "transient" professional corporation known as Seasoned Chiropractic, P.C. ("Seasoned").   Defendants, using Seasoned, submitted deceptive charges for medically unnecessary neurological patient examinations and electrodiagnostic testing (collectively, the "Fraudulent Services") to individuals ("Insureds") who were involved in automobile accidents and eligible for insurance coverage under the Plaintiffs' insurance policies. The actions taken by the Defendants were part of a scheme perpetrated against the Plaintiffs whereby the treatment provided, to the extent it was provided at all, was based upon a preset protocol designed solely to maximize the amount of billing submitted to the Plaintiffs without regard to the injuries allegedly sustained or the individual needs of the patients.   In total, the defendants have submitted approximately Eight Hundred and Sixty Thousand Dollars ($860,000.00) in No-Fault claims to GEICO.

2.     In addition, GEICO seeks a declaration that they are not legally obligated to pay any pending No-Fault insurance claims that have been submitted by or on behalf of Defendants, Seasoned and Joseph Lodespoto, Jr., D.C. ("Lodespoto") because of the following:

i)      the Fraudulent Services were not medically necessary and were provided, to the extent they were provided at all, pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

ii)     in many cases, the Fraudulent Services were never provided in the first instance;

iii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to the Plaintiffs; and

iv)     the Fraudulent Services were provided, to the extent that they were provided at all, pursuant to illegal kickback arrangements between the Defendants and others.

3.    The Defendants fall into the following two categories:

    i)    Seasoned is a medical professional corporation through which the Fraudulent Services purportedly were performed and billed to insurance companies, including GEICO; and

    ii)    Lodespoto is a licensed chiropractor who owns Seasoned and caused Insureds to be subjected to the Fraudulent Services.

4.    As discussed below, Defendants at all relevant times have known that:

    i)    the Fraudulent Services were not medically necessary and were provided, to the extent that they were provided at all, pursuant to a pre-determined protocol that was designed to maximize charges to GEICO;

    ii)    in many cases, the Fraudulent Services were never provided in the first instance;

    iii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

    iv)    the Fraudulent Services were provided, to the extent that they were provided at all, pursuant to illegal kickback arrangements between the Defendants and others.

5.    As such, the Defendants are not and have never been eligible to be compensated for the Fraudulent Services.

6.    The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that the Defendants submitted, or caused to be submitted, to GEICO.

7.    The Defendants' fraudulent scheme began as early as 2013 and has continued uninterrupted through present day.

8.    As a result of the Defendants' conduct, GEICO has incurred damages in excess of One Hundred Ninety Three Thousand Five Hundred Ninety Dollars and Ten Cents ($193,590.10).

## PARTIES

### I.   Plaintiffs

9.      Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company ("GEICO") are Maryland corporations with their principal place of business in Chevy Chase, Maryland.  GEICO is authorized to conduct business and to issue automobile insurance policies in the State of New York.

### II.   Defendants

10.      Defendant Seasoned is a New York professional corporation with its principal place of business in New York, through which many of the Fraudulent Services purportedly were provided and billed to GEICO.  Seasoned is owned as of record by Defendant Lodespoto.

11.      Defendant Lodespoto resides in and is a citizen of New York.  Lodespoto was licensed to practice chiropractic care in New York on July 8, 2003, and purports to provide many of the Fraudulent Services through Seasoned.

## JURISDICTION AND VENUE

12.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. §1367.

13.      Venue in this District is appropriate pursuant to 28 U.S.C. §1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of this Complaint

occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

I.    **An Overview of the No-Fault Laws and Licensing Requirements**

14.    The Plaintiffs underwrite automobile insurance in the State of New York.

15.    New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Reparations Act (N.Y. Ins. Law § 5101, *et seq*.) and the No-Fault Regulation (11 NYCRR 65, *et seq*.) automobile insurers are required to provide personal injury protection benefits ("No-Fault benefits") to their insureds.

16.    No-Fault benefits include up to $50,000.00 per insured for necessary expenses that are incurred for healthcare goods and services. An insured can assign his/her rights to the provider(s) of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered by submitting the claim form required by the New York State Department of Insurance, commonly referred to as an "NF-3".

17.    The No-Fault Insurance Law at § 5102(a)(1) provides that claimants are entitled to recover for "basic economic loss," including "[a]ll necessary expenses incurred for: (i) medical, hospital (including services rendered in compliance with article forty-one of the public health law, whether or not such services are rendered directly by a hospital), surgical, nursing, dental, ambulance, x-ray, prescription drug and prosthetic services; (ii) psychiatric, physical and occupational therapy and rehabilitation."

18.    Likewise, Regulation 68 at 11 NYCRR 65-1.1 provides that compensable medical expenses "shall consist of necessary expenses for:

(a) medical, hospital (including services rendered in compliance with Article 41 of the Public Health Law, whether or not such services are rendered directly by a hospital), surgical, nursing, dental, ambulance, X-ray, prescription drug and prosthetic services;

(b) psychiatric, physical and occupational therapy and rehabilitation;

(c) any nonmedical remedial care and treatment rendered in accordance with a religious method of healing recognized by the laws of New York; and

(d) any other professional health services."

19.     Section 65-3.16 of the No-Fault Law prescribes payment of benefits shall be in accordance with fee schedules promulgated by the Superintendent of Financial Services.  Through Insurance Law § 5108, the No-Fault regulation adopted the fee schedule previously established by the Workers' Compensation Board and granted the Superintendent of Insurance authority to create new schedules not already established by the Workers' Compensation Board.

20.     Insurance Law § 5108(c) states that "[n]o provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

21.     When a provider of healthcare services submits a claim for No-Fault benefits using the current procedural terminology ("CPT") codes set forth in the fee schedule, it represents that: (i) the service described by the specific CPT code used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

22.     Further, pursuant to the No-Fault Laws, a health care provider operating as a professional corporation is not eligible to bill for or to collect No-Fault benefits if it unlawfully incorporated or fails to meet any New York State or local licensing requirements necessary to provide the underlying services.

23.     The implementing regulation adopted by the Superintendent of Insurance, 11

N.Y.C.R.R §65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section
> 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New
> York State of local licensing requirement necessary to perform such service in New
> York…

24.     Pursuant to Insurance Law §403, the NF-3s and HCFA-1500 forms submitted by a

healthcare services provider to GEICO, and to all other automobile insurers, must be verified by

the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance
> company or other person files an application for insurance or statement of
> claim containing any materially false information, or conceals for the
> purpose of misleading, information concerning any fact material thereto,
> commits a fraudulent insurance act, which is a crime.

## II.     Background and Overview of the Fraudulent Scheme

25.     Lodespoto  was  licensed to practice chiropractic in 2003.

26.     Lodespoto has served as the record owner of at least 10 professional corporations,

including Seasoned, Artistic Chiropractic, PC, Right Touch Chiropractic, PC, Utica Park

Chiropractic of NY PC, Lodes Chiropractic PC, Lodes Acupuncture Physical Therapy PC, Kazu

Acupuncture PC, Bones Chiropractic PC Remedy Chiropractic PC, which have operated at

numerous multi-disciplinary "No-Fault" clinics.  In addition, Lodespoto has purported to provide

services at various multi-disciplinary No-Fault clinics for Direct Chiropractic PC, Stone

Chiropractic PC and Nerve Diagnostic PC.

27.     Lodespoto received a chiropractic certification to perform electrodiagnostic testing

in 2012.

28.     After the incorporation of Seasoned in 2013, Lodespoto, through Seasoned, began performing chiropractic care until 2015 when these services ceased and the entity limited itself to electrodiagnostic testing and examinations in connection with the electrodiagnostic testing.

29.     Beginning in 2015 and continuing through the present day, Lodespoto concocted a complex fraudulent scheme to defraud GEICO, including various other New York automobile insurance carriers, by utilizing Seasoned to effectuate a fraudulent treatment protocol that subjects Insureds to medically unnecessary examinations and electrodiagnostic testing for the sole purpose of maximizing profits through the submission of thousands of bills for No-Fault reimbursement.

30.     The Fraudulent Services billed under Seasoned are medically unwarranted and falsely exaggerate the nature and degree of care.  The Fraudulent Services provided, to the extent they are provided at all, are performed pursuant to the fraudulent treatment protocol that predesignates the same comprehensive level of testing to every Insured with the intention of maximizing profit rather than truly diagnosing any neurological impairment.

31.     Lodespoto does not operate Seasoned at any fixed location, rather Seasoned is a transient professional corporation offering its Fraudulent Services at, at least, twelve different multi-disciplinary No-Fault clinics (the "Clinics.")

32.     While Seasoned no longer offers chiropractic manipulations, Lodespoto renders these services as an employee of various other professional corporations at the Clinics. These same professional corporations then utilize Lodespoto, through Seasoned, to perform neurological testing at the same clinics.

33.     The Clinics, primarily located in Brooklyn, Queens, and the Bronx, supply steady volumes of patients to Seasoned, through no legitimate efforts of Lodespoto.

34.     The Clinics include, among others, the following locations:

- 632 UTICA AVE, BROOKLYN, NY
- 2025 DAVIDSON AVENUE, BROOKLYN, NY
- 444 WILLIS AVE, BRONX, NY
- 381 SUNRISE HWY, LYNBROOK, NY
- 64 NAGLE AVE, NY, NY
- 550 WEST MERRICK ROAD, VALLEY STREAM, NY
- 360 W MERRICK ROAD, VALLEY STREAM, NY

35.     The Clinics supply patients to Seasoned, as well as a "revolving door" of other medical professional corporations, chiropractic professional corporations, physical therapy professional corporations and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's No-Fault insurance system.  In fact, GEICO received billing from each of the Clinics from an ever-changing number of healthcare providers, starting and stopping operations without any legitimate reason beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's No-Fault insurance system.

36.     Lodespoto associated himself with the Clinics and, in exchange for the payment of kickbacks and referral fees, is referred to Insureds to whom Seasoned purports to provide the Fraudulent Services.

37.     The payment of kickbacks and referral fees from Lodespoto to the Clinics allows Seasoned to have access to a steady stream of Insureds that could be subjected to the Fraudulent Services billed under the name of Seasoned.

38.     Lodespoto has no genuine doctor-patient relationship with the Insureds that visit the Clinics, as the patients have no scheduled appointments with Seasoned but are simply directed by the Clinics to subject themselves to the Fraudulent Services without regard to their actual need for the services or the exercise of any genuine medical judgment by Lodespoto.

39.     Seasoned, in fact, does not even own any neurological (EMG/NCV) testing equipment, but instead uses different "agencies" that supply technicians who bring the equipment themselves to the Clinics.

40.     Lodespoto knows that the arrangements involving Seasoned are illegal and, therefore, he took affirmative steps to conceal the existence of the fraudulent scheme, including purporting to enter into legitimate lease agreements for the rental of each Clinic location.

41.     Seasoned's purported leases and rent payments to the Clinics are a sham because Seasoned is purportedly appearing at the Clinics at the request of a referring doctor or chiropractor for the alleged benefit of that provider's patients at the Clinic. Under these circumstances, there is no reason that the Clinic would charge Seasoned rent.

42.     Seasoned's purported leases and rent payments to the Clinics are also a sham because Seasoned is not performing any legitimate, medically necessary service to the patients of the Clinics. The referrals to Seasoned are made without regard for the necessity of the services, the patients' individual symptoms or needs, or the future care of the patient.

43.     No legitimate professional owner of a medical clinic, exercising independent judgment in the best interests of patients, would defer or direct patients to Seasoned for treatment or services in their same clinic when the Fraudulent Services that Seasoned purports to perform and/or provide play no genuine role in the treatment or care of the patients.

44.     Seasoned's alleged leases and rental payments are simply part of Lodespoto's scheme to conceal the payment of kickbacks and referral fees to the Clinics in exchange for supplying a steady stream of patients to Seasoned that could be subjected to the Fraudulent Services.

45.     The actions undertaken by Lodespoto and Seasoned have victimized No-Fault insurers, such as the Plaintiffs, and have endangered its patients and the public at large.

**III.     The Fraudulent Billing Protocol**

46.     Seasoned's referrals originate from the multi-disciplinary Clinics that accept No-Fault Insureds as patients and to whom they subject immeasurable amounts of medical testing and treatment prior to introducing Seasoned and Lodespoto.

47.     Despite the treatment and testing already provided to these Insureds, the Defendants knowingly accept referrals of patients who do not present symptoms that hint at neurological impairment. Further, the services purportedly provided, to the extent they are provided at all, are not specifically tailored to a patient's unique set of circumstances but rather are predetermined and identical.

48.     Several of GEICO's Insureds, who allegedly were injured in motor vehicle accidents and were purportedly evaluated and tested by the Defendants, provided statements detailing the medical services they received.

49.     These statements reveal the extent of Defendants' fraudulent billing protocol as the claims submitted by Seasoned to the Plaintiffs are inconsistent with the testimony provided by the Insureds.

50.     The evidence unmistakably indicates the Defendants induced the Insureds to accept Fraudulent Services, to the extent they were provided at all, which were not medically necessary but pursuant to a pre-determined fraudulent billing protocol solely designed to financially enrich the Defendants, rather than to treat or benefit the Insureds.

51.     The testimony provided by the Plaintiffs' Insureds revealed that the charges received for neurological examinations and electrodiagnostic testing charged by Seasoned were fraudulent in that:

       i)     the levels of services were misrepresented and exaggerated to inflate charges in that the services were incompletely performed, the time spent was less than what was reported; and

       ii)    in several instances, the services were never provided at all.

52.     Plaintiffs' investigation further revealed that Seasoned's Fraudulent Services are performed without prior consideration of a patient's history, symptomology or complaints of pain. Tests results are duplicated, adding minor changes to shield the Defendants' forgery.

53.     Patients' test results appear indistinguishable because the Fraudulent Services employed, to the extent they are actually performed, are not intended to honestly diagnose any neurological impairment but are structured to enable Seasoned to submit as many charges permissible under the No-Fault fee schedule. Moreover, the alleged neurological examinations serve a second purpose of falsely justifying the electrodiagnostic testing subsequently performed, if performed at all.

**A.     The Initial Examinations**

54.     Defendants' fraudulent billing protocol begins with an initial examination, or a charge of an examination, along with the preparation of medical records that indicate a predetermined diagnosis suggesting a medical need for electrodiagnostic testing.

55.     The Defendants billed the Plaintiffs for initial examinations under Current Procedural Terminology ("CPT") code 99203 which always generates a charge of $54.73.

56.     Under the applicable No-Fault fee schedule, the code specifically state:

**99203** Office or other outpatient visit for the evaluation and management of a new patient which requires these 3 key components: A detailed history;

12

a detailed examination; and medical decision making of low complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of moderate severity. Physicians typically spend 30 minutes face-to-face with the patient and/or family.

57.     A "detailed" examination is further explained as one that meets the following criteria:

(i) *Patient history*:  The documentation of four or more elements of the history of the present illness, or of the status of three chronic medical conditions. One element from the past medical history or social history or family history is also required.  The review of systems should inquire about the system directly related to the history of the present illness and at least two to nine additional systems.

(ii) *Detailed examination*:  The documentation of at least twelve elements in two or more organ systems(s) or body area(s).  Alternatively, documentation of six organ systems or body areas with at least 2 elements each is allowed as well.

(iii)  *Medical decision making of low complexity*:  This is split into three components: diagnosis, data and risk.  The level is determined by a complex system of points and risk.

58.     Plaintiffs' investigation revealed that Defendants' history were swiftly conducted without reviewing patients' medical records or providing more than minimal attention to their medical history.

59.     Further, the physical examinations were completed, to the extent they were performed at all, within minutes and consisted of documenting vital signs, basic range of motion and muscle strength, a general neurological and brief interview.

60.     Based on, among other things, the testimony of Plaintiffs' Insureds, the examinations do not measure the definition of "detailed" referenced above.

61.     Thus, charges submitted by the Defendants to the Plaintiffs for initial examinations utilizing CPT code 99203 misrepresented the degree as "detailed."

62.     Defendants falsely represented the length of time spent conducting these examinations.  CPT code 99203 typically requires a physician typically spend 30 minutes face-to-face with a patient or a patient's family.  Plaintiffs' Insureds reported the examinations were completed in considerably less time, to the extent they were provided at all, which reveals the Defendants' disingenuous attempts to pad billing.

63.     Moreover, the Defendants misrepresented the severity of the Insureds' presenting injuries in order to submit bills to the Plaintiffs using CPT code 99203. CPT code 99203 involves medical problems of moderate severity. The injuries presented by Seasoned's patients were far less severe than moderate and often did not justify any neurological assessment; however, the Defendants intentionally used CPT code 99203 as this code provides greater reimbursement.

64.     GEICO's Insureds AA, JA, AD and MN denied experiencing neurological symptoms and were mutually unaware of the need for electrodiagnostic testing.  In several instances, it was the clinic's receptionist who advised the Insured that neurological testing had been ordered.

65.     If any of the Insureds referred to the Defendants truly required neurological assessments, then CPT code 99201, which requires the presenting problems be self-limited or minor, or CPT code 99202, which involves straightforward medical decision making, should have been chosen.  However, since CPT codes 99201 and 99202 offer lower reimbursement than that of CPT code 99203, the Defendants intentionally misrepresented the severity of injuries in order to justify charges using CPT code 99203.

66.     Furthermore, virtually every initial examination resulted in the same or largely similar preset diagnosis, impression, prognosis and recommendation used in an attempt to legitimize further Fraudulent Services.

67.     Among other misrepresentations detected in Defendants' billing, Defendants on various occasions charged for conducting an initial examination when no such examination was performed.

68.     The gravity of Defendants' fraudulent billing protocol was revealed through the testimony of GEICO Insureds AA, AD and LH, all of whom denied receiving any form of examination prior to undergoing neurological testing. Contrary to the statements received from these Insureds, the Defendants remitted bills representing detailed thirty-minute examinations were performed.

**B.     Electrodiagnostic Tests**

69.     Seasoned and Lodespoto charged the Plaintiffs for various electrodiagnostic tests, such as nerve conduction velocity (NCV) tests and electromyography (EMG) tests, allegedly used to diagnose radiculopathies suffered by their patients.

70.     Radiculopathy is dysfunction or malfunction of a spinal nerve root which can be caused by compression. While the nerve root is the source of the injury, the pain radiates out to the part of the body served by that nerve and can also cause numbness, tingling, weakness and reflex loss along the course of the nerve.

71.     Causes of radiculopathy include: mechanical compression of the nerve root by a disc herniation, bone spur or thickening of surrounding ligaments; a tumor; scoliosis; diabetic ischemia, infection, or inflammation.  Acute trauma from a car accident can infrequently lead to damage to the discs, muscles and ligaments as well as to the nerves travelling throughout the spine and body from the neck to the lower back or to the arms and legs.

72.     The diagnosis of radiculopathy begins with a neurological history and examination to evaluate the patient's muscle strength, sensation and reflexes to find the focal abnormalities. A

15

patient may be sent for an X-ray or CT scan to identify the presence of trauma, osteoarthritis, tumor or infection. An MRI scan may be necessary to provide a better look at the soft tissues around the spine including the nerves, the discs and ligaments. Specialized nerve tests like NCVs and EMGs are designed to confirm the diagnosis of any abnormality in the functioning of the spinal nerve roots.

73.     Within the human body there are 31 pairs of spinal nerves which are identified according to where they leave the spinal column. There are eight pairs of cervical nerves, twelve pairs of thoracic nerves, five pairs of lumbar nerves, five pairs of sacral nerves and one pair of coccygeal nerve roots. Peripheral nerves consist of sensory and motor nerve fibers. Sensory nerves and fibers collect and carry sensory information from the skin and joints to the brain while motor nerves transmit signals from the brain to initiate muscle activity.

        *1)*    *NCVs*

74.     A NCV test provides information about abnormal conditions in the peripheral nerves. Peripheral nerves are stimulated with electrical impulses by a pair of electrodes while recording electrodes detect the transmitted electrical impulse "down-stream" from the stimulator.

75.     The test has four components: (i) motor, (ii) sensory, (iii) F-wave study and (iv) H-reflex study. There are both motor and sensory peripheral nerves, containing sensory and motor nerve fibers, in the limbs that can be tested through a NCV. F-wave and H-reflex studies track the time it takes for an impulse to travel from a stimulus site in a limb to the spinal cord and back.

76.     The same machine is used for both EMGs and NCVs. In recording a NCV, the machine records the timing of a nerve response (the "latency"), the magnitude of the response (the "amplitude") and the speed at which the nerve conducts the impulse over a measured value (the "conduction velocity"), and presents a graphic representation of the changes in amplitude which

forms the action potential in wave form. Reference values are used to define the limits of normal function and are compared with test values to determine if they are outside the range which would suggest the presence of some form of neuropathy.

77.     Each patient requires a unique NCV, meaning their history, physical examination and real time results will determine which sensory fibers, motor fibers or both in any such peripheral nerve should be tested. Therefore, the number of peripheral nerves and type of fibers tested should vary from patient to patient.

78.     In many cases, the Defendants billed for NCVs using CPT codes 95900, 95903 95904, and 95934. A description of the codes reads as follows:

> **95900** Nerve conduction, amplitude and latency/velocity study, each nerve; motor, without F-wave study.
>
> **95903** Nerve conduction, amplitude and latency/velocity study, each nerve; motor with F-wave study
>
> **95904** Nerve conduction, amplitude and latency/velocity study, each nerve; sensory
>
> **95934** H-reflex, amplitude and latency study; record gastrocnemius/soleus muscle

79.     Based on GEICO's investigation, Defendants' patients did not report symptoms of radiculopathies or neuropathies. Therefore, NCVs were needlessly ordered pursuant to the fraudulent billing protocol.

80.     If any of Defendants' patients did present complaints or findings associated with radiculopathy, i.e. numbness, tingling, burning and/or weakness of the arms and/or legs, the tests performed were nevertheless improper because the Defendants did not tailor NCV tests to their patient's unique set of circumstances. Instead, they utilized the same sequence of peripheral nerves and nerve fibers repeatedly for patient after patient.

81.     Further, the Defendants routinely tested far more nerves than what is deemed recommended policy thereby inexcusably subjecting their patients to painful and needless testing.

82.     The American Association of Neuromuscular & Electrodiagnostic Medicine's ("AANEM") offers a "Maximum Number of Studies Table" which is a chart defining the medical standard of the maximum amount of tests necessary for a physician to arrive at a diagnosis which is applicable in 90% percent of cases. Its purpose is to assist in distinguishing appropriate charges from those that are abusive. To the extent NCV testing was actually performed, the manner in which the Defendants employed NCV tests offends the standard set by AANEM.

2)     *EMGs*

83.     An EMG evaluates and records electrical activity produced by muscles, focusing on their nerve supply; *i.e.* spinal nerve roots and peripheral nerves. It is a test which involves inserting a needle electrode through the skin into the muscle that is being studied. EMGs, unlike NCVs, track denervation and reinnervation of the axon. An EMG maps each muscle's activity during insertion, at rest and during muscle contraction. The results are recorded in audio, video and in real time.

84.     The Defendants billed for EMGs using CPT codes 95861and 95864.  The Fee Schedule specifies that these codes represent:

> **95861**  Needle Electromyography; 2 extremities with or without related paraspinal areas
>
> **95864**  Needle Electromyography; 4 extremities with or without related paraspinal areas

85.     Based on GEICO's investigation, the Defendants' patients did not report symptoms of radiculopathies therefore the EMGs were purportedly conducted pursuant to the fraudulent billing protocol.

86.    If any of Defendants' patients did present neurological symptoms, the EMGs performed were medically useless since the tests were not customized to a patient's unique set of circumstances.  The same muscles in the same limbs were purportedly evaluated in every EMG charged to the Plaintiffs. Thus, unreliable test results were of no use to any referring physician.

87.    Further, the manner in which the Defendants performed the EMGs defies acceptable practice.  Within the medical community, two limbs are sufficient to diagnose radiculopathy in ninety percent of cases.  The Defendants consistently tested all four limbs which the AANEM deems excessive.

88.    In several instances, the testing, to the extent it was performed at all, was performed incorrectly in an incomplete manner wherein a needle may not have been inserted into the skin.

89.    Insured IV, whom Plaintiffs received a bill for EMG testing on all four limbs, indicated no needle penetrated her skin.  Charges for a two limb EMG was submitted to the Plaintiffs for Insured AT; however, AT denied bleeding as a result of the test and considered the test fairly painless.  Insured AA testified undergoing an EMG which was performed in only six minutes.

90.    The Defendants therefore not only misrepresented that EMG tests were performed but also fabricated test results to safeguard their fraudulent billing protocol.

91.    The testing performed, to the extent it was performed at all, was done so out of financial motivation and not for the benefit of the Insureds. Most patients were never explained the results of the tests performed by the Defendants and their treatment regime remained the same.

92.    Defendants fraudulent conduct includes remitting charges to the Plaintiffs for testing that was never performed. For example, Insured EM denied undergoing any neurological

testing. However, the Plaintiffs received charges for both EMG and NCV testing claimed to have been performed on Insured EM.

## IV.    The Defendants' Fraudulent Concealment and Plaintiffs' Justifiable Reliance

93.    The Defendants have submitted, or caused to submitted, a voluminous number of NF-3, HCFA-1500 forms, and supporting documentation to the Plaintiffs seeking payment for Fraudulent Services they knowingly knew they were not entitled to receive.

94.    The NF-3, HCFA-1500 forms, and supporting documentation submitted to the Plaintiffs contained material misrepresentations claiming the Fraudulent Services were medically necessary when they were provided, to the extent they were provided at all, pursuant to a fraudulent billing protocol.

95.    The NF-3, HCFA-1500 forms, and supporting documentation submitted to the Plaintiffs contained misrepresentations exaggerating the level and nature of the Fraudulent Services performed, to the extent they were performed at all, as the Fraudulent Services were rendered pursuant to a fraudulent billing protocol.

96.    The Defendants disregarded legal and ethical obligations by submitting, or causing to be submitted, billing that they knew contained material misrepresentations.

97.    While the Plaintiffs grew suspicious of Seasoned's billing, they continued throughout the course of their investigation of Seasoned and Lodespoto to abide by claim procedures set forth in the No-Fault regulations concerning the issuance of No-Fault denials and requests for additional verification.

98.    As a result, the Plaintiffs either: (i) timely paid claims; (ii) timely and appropriately denied claims for No-Fault benefits submitted by the Defendants; or (iii) timely issued requests

for additional verification with respect to all of the pending claims for No-Fault benefits submitted by the Defendants, and, therefore the Plaintiffs' time to pay or deny claims has not yet expired.

99.      The Plaintiffs are statutorily and contractually obligated to swiftly and fairly process claims within thirty days upon receipt. The NF-3, HCFA-1500 forms, and supporting documentation submitted to the Plaintiffs, containing the material misrepresentations described above, were submitted to induce payment by the Plaintiffs who were led to justifiably rely on them causing Plaintiffs to incur more than One Hundred Ninety Three Thousand Five Hundred Ninety Dollars and Ten Cents ($193,590.10) in damages.

100.      The Plaintiffs undertook an investigation which comprised of collecting all fraudulent billing and medical reports for inspection and comparison, interviewing Insureds, conducting database searches and obtaining additional verification.

101.      As the investigation only recently concluded, the Plaintiffs were unable to minimize their damages until the results of the investigation were available.  This complaint was filed promptly after it was determined that Seasoned is rendering services that are fraudulent and in violation of New York Law and public policy.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Against the Defendants
### (Declaratory Judgment – 28 U.S.C. §§2201 and 2202)

102.      GEICO incorporates, as though fully set forth herein, each and every allegation in pargraphs1 through 101 above.

103.      There is an actual case in controversy between GEICO and the Defendants regarding billing for the Fraudulent Services that has been submitted to GEICO with a total amount

of damages incurred of One Hundred Ninety Three Thousand Five Hundred Ninety Dollars and Ten Cents ($193,590.10).

104.     As detailed throughout this complaint, the Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided, to the extent they were provided at all, pursuant to a pre-determined protocol that served to financially enrich the Defendants, rather than to diagnose, treat or otherwise benefit the Insureds.

105.     The Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services misrepresented and exaggerate the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

106.     Accordingly, GEICO request a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Seasoned and Lodespoto**
**(Common Law Fraud)**

107.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 106 above.

108.     The Defendants knowingly made false and fraudulent statements of material fact to GEICO in the course of the submission of Eight Hundred and Sixty Thousand Dollars ($860,000.00) in charges seeking payment for the Fraudulent Services.

109.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed services were medically

necessary, when in fact the billed services were not medically necessary and were performed pursuant to a pre-determined protocol; and (ii) in every claim, the representation that the billing appropriately reflected the level of services performed, when in fact the billing codes used for the Fraudulent Services and the manner in which the services were described misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO. A representative sample demonstrating the pattern of the Defendants' fraudulent billing is attached hereto as Exhibit "1."

110.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Seasoned that were not compensable under the No-Fault laws.

111.    GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least One Hundred Ninety Three Thousand Five Hundred Ninety Dollars and Ten Cents ($193,590.10) pursuant to the fraudulent bills submitted by the Defendants through Seasoned.

112.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
### Against Seasoned and Lodespoto
### (Unjust Enrichment)

113.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 112 above.

114.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

115.    When GEICO paid the bills and charges submitted by or on behalf of Seasoned for No-Fault benefits, they reasonably believed that they were legally obligated to make such payments based on the Defendants' improper, unlawful and/or unjust acts.

116.    The Defendants have been enriched by payment from GEICO, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

117.    Defendants' retention of payments from GEICO violates fundamental principles of justice, equity and good conscience.

118.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than One Hundred Ninety Three Thousand Five Hundred Ninety Dollars and Ten Cents ($193,590.10).

### JURY DEMAND

119.    Pursuant to Federal Rule of Civil Procedure 38(b), Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demands a trial by jury.

**WHEREFORE,** Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202, that the Defendants have no right to receive payment for any pending bills submitted to Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company;

B.      On the Second Cause of Action against the Defendants, compensatory damages in favor of Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company in an amount to be determined at trial but in excess of One Hundred Ninety Three Thousand Five Hundred Ninety Dollars and Ten Cents ($193,590.10), together with, costs, interest and such other and further relief as this Court deems just and proper; and

D.      On the Third Cause of Action against the Defendants, more than One Hundred Ninety Three Thousand Five Hundred Ninety Dollars and Ten Cents ($193,590.10) for unjust enrichment plus costs and interest and such other relief as this Court deems just and proper.

Dated:  Melville, New York
        March 22, 2018

                                    BRUNO, GERBINO & SORIANO, LLP

                                    By: _____
                                        Vincent F. Gerbino (VG 0555)
                                        Michael A. Callinan (MC 7052)
                                    *Attorneys for Plaintiffs*
                                    445 Broad Hollow Road, Suite 220
                                    Melville, New York 11747
                                    Telephone: (631) 390-0010
                                    Facsimile: (631) 393-5497
                                    vgerbino@bgslaw-ny.com
                                    mcallinan@bgslaw-ny.com
                                    BG&S No.: 125-3018